UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ARISA MEGAN BARRINGER,

    Plaintiff,

v.                                              Case No. 8:20-cv-1649-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## ORDER

    This is an appeal of the administrative denial of supplemental security income (SSI) and disability insurance benefits (DIB).[1] *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff argues her case should be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) because substantial evidence does not support the ALJ's decision to discount the opinions of treating physician Rekha Issar, M.D., consultative physician E.R. Lamm, M.D., medical expert Sonya Clark, D.O., and consultative psychologist Tracey Henley, Psy.D. After considering Plaintiff's arguments, Defendant's response, and the administrative record (docs. 12, 15, 16), I find the ALJ's decision is supported by substantial evidence. I affirm.

    A.  *Background*

    Plaintiff Arisa Barringer, born on May 3, 1985, was 30 years old on her alleged onset date of September 30, 2015. (R. 20) After dropping out of high school in the tenth grade, Plaintiff worked in housekeeping and the front office of a hotel, at McDonald's, Subway, Little Caesar's Pizza (assistant manager), Get and Go convenience store, Dollar General,

---

[1] The parties have consented to my jurisdiction under 28 U.S.C. § 636(c).

Circle K, Wal-Mart, K-mart, and at a residential door repair company. (R. 65-70)  Plaintiff is single and lives with her two minor children. (R. 58)

Beginning in March 2014, Plaintiff was in three car accidents she blames for her chronic neck and back pain (her other car accidents were in May 2017, and May 2019). Plaintiff alleges disability due to cervicalgia, brachial neuritis or radiculitis, migraines, constant pain in her neck and shoulders, thoracic spine pain, lumbago, arm numbness, small disc protrusion at C4-5 and C6-7, and disc herniation at C5-6. (R. 446)  According to Plaintiff, her "biggest problem is pain . . . from my neck and my shoulders, both . . . it's constant . . . It's a lot of pressure.  My neck gets tired.  I have a hard time holding my neck up for very long." (R. 42)  Looking up is especially painful: "[I]f I look up, I start to see like sparkly dots." (R. 44)  She had a cervical spine discectomy in 2015, which improved her range of motion but caused pain and numbness down her arms.

Plaintiff testified that her constant pain triggers anxiety because she cannot do the things she needs to do.  "If I have too many things to do at one time, like the kids' homework, dinner needs to be cooked, my back's hurting, my neck's hurting, and it's like if anything really, because, you know, being a mom, you have a lot of things to do, and a lot of times I don't get the things done.  And I feel like I'm letting my children down." (R. 57)  She estimates she spends 70 percent of her day in bed.  She gets her kids to and from school and grocery shops but otherwise is "in so much pain, that's all I can worry about, is I'm hurting.  My back hurts.  I mean, all I want to do is just lay in bed." (R. 58)

Plaintiff's claim took an unusual procedural path – she had three administrative hearings.  At the conclusion of her first hearing in January 2018, the ALJ ordered physical and psychological consultative examinations to develop the record. (R. 82-83)  After these

examinations (by Drs. Lamm and Henley, whose reports are at issue here), the ALJ convened a second hearing in September 2018, at which medical expert and internist Julian Malamad, M.D. appeared and testified. (R. 122-44) At Plaintiff's attorney's request, however, the ALJ struck Dr. Malamad's testimony because he was unfamiliar with social security law, and his testimony contradicted the record (the ALJ acknowledged that Dr. Malamad's testimony caused more "confusion" than "clarification"). (R. 141-43)

The ALJ adjourned the second hearing and sent medical interrogatories to orthopedic surgeon Dr. Clark. In September 2019, Dr. Clark's interrogatories in hand, the ALJ convened a third hearing. (R. 87-113) Besides Plaintiff, testifying was medical expert and orthopedic surgeon Ronald Kendrick, M.D.

In her written decision issued on September 19, 2019, close on the heels of Plaintiff's third hearing, the ALJ found Plaintiff has the severe impairments of "degenerative disc disease of the cervical spine, obesity, headaches/migraines, and diverticulosis."[2] (R. 13) The ALJ determined that Plaintiff's anxiety, depression, hemorrhoids, gastritis, hyperlipidemia, asthma, and hypertension were all non-severe impairments. (*Id.*) Aided by the testimony of a vocational expert (VE), the ALJ determined Plaintiff is not disabled as she retains the RFC to perform sedentary work with limitations:

> The claimant can occasionally lift or carry 10 pounds and can frequently lift or carry 10 pounds; can sit for a period of 6 hours; stand and walk for a period of 2 hours for a combination of 4 hours; can push/pull as much as they can lift/carry; occasionally overhead reaching bilaterally; frequently reach in other directions bilaterally; frequent bilateral handling, fingering, and feeling; occasionally climb ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no exposure to

---

[2] Plaintiff's date last insured (DLI) for DIB purposes was September 30, 2019. (R. 13) For DIB claims, a claimant is eligible for benefits if she demonstrates disability on or before her DLI. 42 U.S.C. § 423(a)(1)(A). Plaintiff must show she was disabled on or before September 30, 2019. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

> unprotected heights or moving mechanical parts; frequent exposure to dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibration; requires a sit/stand alternative or the ability to alternate positions after a period of 30 minutes; require frequent extension, rotation and flexion of the neck.

(R. 15) Based on the VE's testimony, the ALJ found that, with this RFC, Plaintiff could not perform her past relevant work but could work as a document preparer, addresser, and call out operator. (R. 21) The Appeals Council denied review. Plaintiff, having exhausted her administrative remedies, filed this action (doc. 1).

    B. *Standard of Review*

To be entitled to DIB and/or SSI, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits her ability to perform work-related functions); (3) whether the severe

4

impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform her past relevant work; and (5) if the claimant cannot perform the tasks required of her prior work, the ALJ must decide if the claimant can do other work in the national economy in view of her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g); 20 C.F.R. § 416.920(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

C. *Analysis*

Plaintiff contends the ALJ erred by discounting the opinions of treating physician Dr. Issar, consultative examiners Drs. Lamm and Henley, and medical expert Dr. Clark (Doc. 15). Each medical professional completed medical source statements opining Plaintiff is more

5

limited than the RFC the ALJ formulated.  The Commissioner counters that the doctors' statements were inconsistent with the rest of the medical evidence (Doc. 16).  After reviewing the record, I agree with the Commissioner.

### 1. Plaintiff's medical timeline

An overview of Plaintiff's health history is helpful because the record is voluminous and Plaintiff challenges the ALJ's treatment of four medical professionals.  In March 2014 (a year and a half before her onset date), Plaintiff was in a car accident and injured her back and neck. (*See* R. 594-95)  An MRI revealed small central disc protrusions at C4-5 and C6-7 and an annular tear at C4-5. (R. 814-15) After a year of doctor's appointments and back and forth with her insurance company, in March 2015, Plaintiff had a C5-6 cervical discectomy performed by spinal surgeon Gary Moskovitz, M.D. (R. 643-45)  She was discharged the same day with instructions to sleep in a cervical collar until healed. (R. 664-67)  Two weeks later, on April 8, 2015, Dr. Moskovitz cleared Plaintiff to return to work. (R. 688)

Later that month, Plaintiff went to the ER at Bartow Regional Medical Center complaining of unresolved neck pain; she was discharged with a prescription for pain medication. (R. 675-78)  In June 2015, at a follow-up appointment with Dr. Moskovitz, he noted Plaintiff had an increased range of motion.  Plaintiff still complained of neck pain, but Dr. Moskovitz opined she had reached maximum medical improvement. (R. 682)  The next month, Plaintiff slipped in the shower.  Although she caught herself before falling, she went to the ER in pain.  Doctors diagnosed her with a mild cervical sprain. (R. 698-713)  Then, in September 2015, her back pain had increased to where she felt she could no longer work; she filed her disability claim in November 2015.

6

In March 2016, Amin Saphalaxmi, M.D., a family practice doctor at Doctor Today, prescribed Plaintiff sertraline for anxiety and depression and advised her to do stretching exercises to help with her back pain. He referred her to physical therapy and ordered an updated MRI, which showed no significant spinal stenosis. But Plaintiff's pain persisted and in September 2016, she returned to Doctor Today and asked for a referral to an orthopedic surgeon because she wanted another spinal surgery. (R. 798)

Plaintiff also visited the ER regularly in 2016 and 2017. In February 2016, she went to the ER for neck pain; in April 2016, for thoracic and lumbar pain, rectal bleeding, abdominal pain, headaches, and vomiting; in July 2016 for ear pain and a cough; twice in September 2016 for upper back and shoulder pain and because she was pregnant; once in October 2016 for back pain; twice in November 2016 for dizziness and vomiting with abdominal pain and eye drainage; and once in December 2016 when she accidentally swallowed hydrogen peroxide. The pattern continued in 2017: Plaintiff went to the ER twice in January 2017 for neck pain and constipation, once in March 2017 for shortness of breath and a cough, once in May 2017 following another car accident (her second; she drove her car into a ditch to avoid an oncoming vehicle swerving into her lane), and again in June 2017 for neck and back pain. (R. 823-1033)

Dr. Issar, another Doctor Today physician, treated Plaintiff once, in January 2017, to review the results of a recent pap smear and lab tests.[3] (R. 785-87) Plaintiff complained of

---

[3] Plaintiff treated at Doctor Today many times between 2016 and 2018, with a handful of providers, but Dr. Issar only treated Plaintiff once. Under these circumstances, whether he should be considered a "treating physician" is arguable. *See McSwain v. Bowen,* 814 F.2d 617, 619 (11th Cir. 1987) (one-time examiners are not treating physicians); *Coheley v. Comm'r of Soc. Sec.*, 707 F. App'x 656, 659 (11th Cir. 2017) (doctor who examined plaintiff only twice was not a treating physician). Nonetheless, I assume Dr. Issar was Plaintiff's treating

7

neck and shoulder pain and dizziness but overall said she was "feeling pretty good." (R. 785) She had missed her period and was concerned she was pregnant. Dr. Issar noted Plaintiff's neck and shoulders had normal alignment and mobility and she had full range of motion and normal strength in all extremities. Plaintiff complained of diarrhea, abdominal pain, and pain in multiple joints, but otherwise Dr. Issar's findings were normal.

In May 2017 (after her second car accident), Plaintiff complained to Doctor Today providers of constant pain and requested a pain management referral. (R. 778) She had rectal pain and blood in her stool, shortness of breath, dizziness, and fatigue. And she was anxious and sad in August 2017. (R. 769) The next month, a Doctor Today physician prescribed her Relafen and Flexeril for her neck and back pain (R. 766), and in October 2017, Plaintiff reported shoulder pain, constant headaches, and hand spasms. (R. 757) She had lifted her son and thrown out her back. (R. 753) She recounted to Doctor Today physician Jean Balan, M.D. she had suffered neck and back pain for three years and now her shoulder hurt with the pain radiating down her legs. (R. 748) Dr. Balan noted Plaintiff had normal range of motion and strength and advised her to complete her medication first and "follow up with Dr. Issar with old MRI result."[4] (R. 750)

Shortly thereafter, in January 2018, Dr. Issar completed a check-the-box medical source statement indicating Plaintiff had limited motion in her spine, muscle weakness, and sensory or reflex loss. (R. 1034) He opined Plaintiff could not perform fine or gross movements effectively and needed to change position more than once every two hours. (*Id.*)

---

physician and find, for the reasons stated in this Order, that the ALJ articulated good cause to discount his medical source statement.

[4] It does not appear this follow-up occurred.

He circled options indicating that, due to severe pain, Plaintiff could walk up to two hours per day, stand for 30 minutes at a time, sit for one hour at a time, occasionally lift 20 pounds, frequently lift five pounds, and had a limited ability to rotate her neck left and right and could never look up. (*Id.*)

That same month, Doctor Today nurse practitioner Jose Subha referred Plaintiff to a pain management doctor. (R. 1076)  She did not follow up on this right away; instead, in February 2018, she returned to Mr. Subha and stated she had recently gone to the ER and was diagnosed with pleurisy (a chest pain syndrome). (R. 1078)  He again referred Plaintiff to pain management.  In March 2018, Dr. Subha prescribed Plaintiff five days of tramadol to control her pain. (R. 1082)

Around that time, Plaintiff treated for the first time with pain management doctor Seth Kaufman, D.O. of Physician Management, LLC. (R. 1045-46) She told him of her surgery and persistent neck and shoulder pain with numbness and tingling down both arms.  On examination, Dr. Kaufman noted Plaintiff had no joint pain or swelling and walked normally.  She had good cervical side bending rotation but pain with extension, normal extension in her lumbar spine and hips, and a negative straight leg raising test.  (R. 1045)  Dr. Kaufman diagnosed Plaintiff with myofascial pain syndrome, stating:  "It is common after an ACDF [anterior cervical discectomy and fusion] that the trapezius and rhomboid muscles to take a lot of stress causing a myofascial pain syndrome.  She should begin with physical therapy [and] I would get updated images of the cervical spine." (R. 1046)  He also gave her a referral for nerve conduction studies. (R. 1049)

Plaintiff's insurance company denied all of Dr. Kaufman's referrals but authorized a cervical spine X-ray, which yielded normal results:  "Impression:  Postop changes at C5-6,

9

otherwise unremarkable cervical spine." (R. 1063)  From that point through July 2019, Plaintiff treated with Dr. Kaufman's office regularly, primarily for medication management (he prescribed her prednisone, tramadol, naproxen, diazepam, Cymbalta, hydrocodone, hydroxyzine, among other medications. (R. 1063-74, 1153-73)).

Next in the timeline are the consultative examinations.  Dr. Henley examined Plaintiff in February 2018, at the ALJ's request (following Plaintiff's first administrative hearing). (R. 1036-39)  She noted Plaintiff's March 2014 car accident (apparently Plaintiff did not tell Dr. Henley about her May 2017 car accident), her cervical fusion, and her constant pain.  Dr. Henley diagnosed Plaintiff with PTSD, major depressive disorder, anxiety, and symptoms of borderline personality disorder.  According to Dr. Henley, Plaintiff's pain caused mild limitations in her ability to interact with the public, moderate limitations in her ability to interact with supervisors and co-workers, and moderate limitations in her ability to respond to changes in a work setting. (R. 1040-42)

In March 2018, Edwin Lamm, M.D. performed Plaintiff's agency-ordered consultative physical examination. (R. 1055)  Dr. Lamm diagnosed Plaintiff with post-laminectomy syndrome yet concluded:  "There is little in the way of any physical limitations that would prevent her from resuming some type of work activity.  [She] needs to be evaluated by mental health expert for anxiety/depression." (R. 1056)  Despite this, in his check-the-box medical source statement accompanying his report, Dr. Lamm indicated Plaintiff could only lift and carry up to 10 pounds; could sit, stand, and walk up to one hour each for a total of three hours each; could occasionally reach bilaterally; could frequently handle, finger, feel, push, and pull; could frequently climb, balance, and stoop; and could perform all activities of personal maintenance. (R. 1057)

At Plaintiff's annual physical exam at Central Florida Health Care, Inc. in August 2018, she "denie[d] any medical concerns." (R. 1188) She had no arm pain on exertion, normal muscle strength and tone, no cyanosis or edema in her extremities, normal gait and station, and intact reflexes bilaterally. (R. 1189) She had limited range of motion in her left leg. (*Id.*) Plaintiff's main goal for the next year was to "exercise more." (*Id.*)

In October 2018, medical expert Sonya Clark, D.O. reviewed Plaintiff's medical records and answered the ALJ's medical interrogatories, opining that Plaintiff could occasionally lift and carry up to 10 pounds but never more. She could sit, stand, and walk for up to an hour at a time each. She could sit for six hours total during a workday. (R. 1148) She could occasionally climb stairs, balance, stoop, and kneel, but could never crouch, crawl, or climb ladders. She could perform basic activities of daily living. (R. 1152)

That same month, a lumbar spine MRI revealed grade 1 spondylolisthesis. (R. 1132) A cervical spine X-ray in March 2019, however, noted Plaintiff's "post-surgical change at the C5-6 level" but "no acute osseous abnormality identified." (R. 1265) A thoracic spine X-ray taken at the same time showed "mild degenerative disc disease changes scattered throughout the thoracic spine. No acute compression fracture noted." (R. 1321)

Then came Plaintiff's third car accident, in May 2019. ER records state: "[Plaintiff] was the restrained driver of vehicle that was struck from behind at low speed. EMS relate minimal to no vehicular damage." (R. 1396) She told her attending doctor her pain was minimal, and she had normal range of motion in her extremities, normal strength, and mild cervical tenderness on palpation. (R. 1398) She was diagnosed with cervical and back strains and discharged. (R. 1400) After that, Plaintiff went to physical therapy and had steroid injections to control her pain. She reported "50% pain reduction after the injection." (R.

11

1356) In July 2019, Plaintiff's physical therapist wrote: "Plaintiff is showing improved cervical ROM, improved scapular strength and decreased pain. Cont[inue] with scapular strengthening and manual therapy." (R. 1370)

Finally, Dr. Kendrick testified at Plaintiff's third hearing in September 2019, as a medical expert. He did not examine Plaintiff but based his testimony on his review of her medical records. He testified Plaintiff had the severe spinal impairments of degenerative disc disease and stenosis and opined these impairments would cause functional limitations that "place her someplace between light and sedentary as far as her musculoskeletal problems are concerned. And that would be lifting 15 pounds occasionally, ten pounds or less frequently, standing and walking for four hours, sitting for six. I'd restrict all of her postural to only occasional." (R. 107) When asked about Drs. Lamm's and Clark's RFC assessments – which the ALJ noted conflicted with Dr. Kendrick's – the doctor testified that Dr. Lamm "basically allows her to be on her feet for six hours, I think that's too much, and I don't see why she would be limited to only three hours of sitting. That is not from his examination . . . nothing in the exam would indicate that she had anything wrong with the anatomical parts especially when she sits." (R. 109) Similarly, Dr. Kendrick did not see the evidentiary basis for Dr. Clark's finding that "provided a sedentary work profile with occasional reaching again bilaterally. And here again I don't see the basis for the reaching being limited[.]" (*Id.*)

### 2. Dr. Issar

Against this medical backdrop, Plaintiff argues the ALJ erred when he discounted Dr. Issar's January 2018 medical source statement as "not supported by the evidence of record. The claimant consistently had normal motor strength, full range of motion, and normal gait."

(R. 19) After reviewing Plaintiff's extensive medical history, I find that substantial evidence supports the ALJ's consideration of Dr. Issar's opinion.

The method for weighing medical opinions under the Social Security Act is in the regulations at 20 C.F.R. §§ 404.1527(c), 416.927(c).[5] Relevant here, the opinions of examining physicians are generally given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. 20 C.F.R. §§ 404.1527(c)(1-5), 416.927(c)(1-5). A court must give a treating physician's opinions substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for disregarding such opinions "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted).

This rule – the "treating physician rule" – reflects the regulations, which recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *Winschel* instructs that with good cause, an ALJ may disregard a treating physician's opinion but "must clearly articulate the reasons for doing so." 631 F.3d at 1179 (*quoting Phillips v. Barnhart*, 357 at 1240 n.8). And the ALJ must state the weight given to different medical opinions and why. *Id*. Otherwise, "it is impossible for a reviewing court to determine whether

---

[5] These sections were rescinded on March 27, 2017, but still apply to claims filed before this date. Plaintiff filed her claim in November 2015. (R. 10)

the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

      The ALJ considers many factors when weighing a medical opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). For instance, the Social Security regulations command that the ALJ consider (1) the examining relationship; (2) the treatment relationship, including the length and nature of the treatment relationship; (3) whether the medical opinion is amply supported by relevant evidence; (4) whether an opinion is consistent with the record as a whole; and (5) the doctor's specialization. *Id*. Non-examining physicians' opinions are entitled to little weight when they contradict the opinions of examining physicians and do not alone constitute substantial evidence. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1260 (11th Cir. 2019) (citation omitted).

      Dr. Issar treated Plaintiff once, for a pap smear and lab work follow-up, and he made primarily normal findings. Despite this, a year (and one car accident) later in January 2018, he completed his check-the-box form indicating Plaintiff had such severe functional limitations she could not work. Assuming Dr. Issar qualifies as a treating physician, the ALJ articulated good cause in discounting his medical source statement. Dr. Issar offered no narrative or explanation connecting his relatively normal physical findings upon examination with his more restrictive RFC assessment a year later. *Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) (discounting treating psychiatrists' mental health questionnaires, noting that check-off forms are "conclusory and provide little narrative or insight into the reasons behind the conclusions" and therefore are of limited probative value). Even though Plaintiff was in a second car accident between the time Dr. Issar treated Plaintiff and when he filled out the medical source statement, there is

no evidence showing her spine impairments worsened during this period. Two cervical spine X-rays taken in March 2018, and March 2019, were normal, a March 2019 thoracic spine X-ray showed only mild degenerative disc disease, and July 2019 treatment records show Plaintiff had a 50% reduction in pain after injections and was responding to physical therapy. As Dr. Issar's January 2018 opinion was inconsistent with his treatment records and other medical evidence, the ALJ properly discounted it.

### 3. Drs. Lamm and Clark

Plaintiff's next argument is that the ALJ improperly discounted Dr. Lamm's RFC assessment, too. The ALJ found:

> As part of the claimant's physical consultative examination, Dr. Lamm completed a medical source statement. This consultative examiner opined that the claimant can perform less than sedentary exertion work noting that she could only sit, stand and walk for [a total of] three hours each in an 8-hour workday. Additionally, Dr. Lamm opined that the claimant could only occasionally reach with the bilateral upper extremities. However, these findings were inconsistent with Dr. Lamm's evaluation. Specifically, Dr. Lamm noted that the claimant has little in the way of any physical limitation. Furthermore, the other evidence of record consistently reveals that the claimant has normal gait, normal muscle strength, and generally unremarkable physical examinations.

(R. 19)

Substantial evidence supports the ALJ's decision to assign little weight to Dr. Lamm's assessment. The ALJ had to consider Dr. Lamm's opinion, and she did. As a one-time consultative examiner, Dr. Lamm's opinion was not entitled to deference. *McSwain*, 814 F.2d at 619. The ALJ cited and discussed other record evidence that contrasted with Dr. Lamm's conclusions, namely Dr. Kendrick's testimony that the medical evidence does not support Dr. Lamm's limitations on sitting, Dr. Issar's findings that Plaintiff had normal muscle strength and full range of motion, Dr. Kaufman's observation that Plaintiff had muscle tightness that

limited her range of motion but could be improved with physical therapy, and Plaintiff's noted improvement with injections and physical therapy. Also important was Plaintiff's testimony she is the primary care giver for her two young children, she grocery shops, takes her kids to and from school, and attends church. And interestingly, Dr. Lamm concluded that Plaintiff had little in the way of physical limitations, which stands in stark contrast with his RFC assessment that Plaintiff's limitations precluded even sedentary work.

Similarly, Plaintiff contends the ALJ erred in her consideration of Dr. Clark's interrogatory responses. The ALJ assigned them no weight:

> After the September 27, 2018 hearing [Plaintiff's second hearing], Dr. Clark completed a medical interrogatory and opined that the claimant can sit, stand, or walk for 1 hour at a time, and can sit for 4 hours in an 8-hour day, and stand or walk for 1 hour[ ] in an 8-hour day. The undersigned gives this opinion no weight. This medical expert's opinion is not consistent with the evidence, which as previously stated, consistently revealed that the claimant had no joint swelling, normal muscle strength, and normal gait.

(R. 19) Dr. Clark reviewed Plaintiff's medical records but did not examine her and did not have a treating relationship with her. For the same reasons the ALJ's consideration of Dr. Lamm's opinions were proper, the ALJ appropriately discounted Dr. Clark's interrogatory responses.

And although Plaintiff does not challenge her RFC determination directly, to the extent Plaintiff claims the ALJ erred because the RFC she formulated differs from the limitations Drs. Lamm and Clark identified, this is meritless. A claimant's RFC is the most work she can do despite any limitations caused by her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In formulating a claimant's RFC, the ALJ must consider all impairments and the extent to which the impairments are consistent with medical evidence. 20 C.F.R. §§ 404.1545(a)(2),(e), 416.945(a)(2),(e). An ALJ may not arbitrarily reject or ignore

uncontroverted medical evidence. *McCruter v. Bowen,* 791 F.2d 1544, 1548 (11th Cir. 1986) (administrative review must be of the entire record; ALJ cannot point to evidence that supports the decision but disregard other contrary evidence). Under the statutory and regulatory scheme, however, a claimant's RFC is a formulation reserved for the ALJ, who must support her findings with substantial evidence. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c).

Here, she has done so. The ALJ, after considering the medical evidence summarized above, determined Plaintiff capable of sedentary work. There is substantial evidentiary support for the ALJ's decision to discount Drs. Lamm and Clark's more stringent limitations. For example, Plaintiff testified she could stand for two hours at a time (R. 54), but Dr. Lamm restricted her to standing only one hour at a time, for a total of three hours a workday (R. 1057), and Dr. Clark restricted her to one hour of standing total. (R. 1148)

### 4. Dr. Henley

Finally, Plaintiff challenges the ALJ's decision to assign little weight to Dr. Henley's medical source statement. Plaintiff argues that Dr. Henley observed her rapid speech, mood swings, and pressured tone, traits consistent with her findings that Plaintiff would have moderate difficulty when interacting with coworkers and supervisors and moderate difficulty dealing with work situations and changes in work settings. The ALJ gave Dr. Henley's opinion "little weight because it is not consistent with the results of the evaluation, which noted that the claimant was able to maintain adequate eye contact and was cooperative with the examiner. Additionally, her thought processes were generally logical during the evaluation." (R. 19)

I find substantial evidentiary support for the ALJ's decision. Interestingly, Plaintiff did not list mental impairments on her benefits applications. (R. 446) And Plaintiff does not

17

challenge the ALJ's finding that her anxiety and depression are non-severe impairments. (R. 13) Dr. Henley was a consultative evaluator, not a treating physician. The ALJ had to evaluate her decision, and she did, but did not have to defer to it. Plaintiff was prescribed medication to control her depression and anxiety, but the record indicates nothing other than conservative mental health treatment. At the time of Dr. Henley's consultative exam, Plaintiff was not undergoing any mental health treatment. As Dr. Henley reported: "She previously participated in counseling, but is not currently in treatment. She has never undergone psychological evaluation or been psychiatrically hospitalized." (R. 1037) Besides noting Plaintiff's logical thought processes, cooperation, and eye contact, Dr. Henley observed that Plaintiff was fully oriented. (R. 1038)

The undersigned reiterates that, when reviewing an ALJ's decision, the Court's job is to determine whether the administrative record contains enough evidence to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

D. *Conclusion*

It is ORDERED:

 (1) The Commissioner's decision is AFFIRMED.

 (2) The Clerk of Court is directed to enter judgment for Defendant and close the case.

18

DONE and ORDERED in Tampa, Florida on September 21, 2021.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE